### In re ROSENBERG et al.

(District Court, S. D. New York. April, 1920.)

Bankruptcy ⟨⇒⟩414 (3)—Evidence does not sustain findings that bankrupt concealed assets.

Evidence that the bankrupt had conveyed certain real estate to his wife's brother-in-law, who already held a mortgage on the premises, and that the bankrupt offered the proceeds of such conveyance to the objecting creditor, *held* not to sustain the referee's finding that the failure to list the property in the bankrupt's schedules constituted a concealment of assets, preventing the bankrupt's discharge.

In Bankruptcy. In the matter of Joseph L. Rosenberg, individually and trading as the Rose Shop & Capitol Millinery, bankrupt. Ida

L. Frese filed objections to the bankrupt's discharge, and the referee recommended that such discharge be denied. Referee's recommendation not approved, and discharge ordered.

Glaze & Fine, of New York City, for objecting creditor.

Nathan N. Sanders, of New York City (C. Edward Benoit, of Brooklyn, of counsel), for bankrupt.

MAYER, District Judge. The referee has recommended that the bankrupt's application for discharge be denied. The objecting creditor, Ida L. Frese, filed six specifications of objections to the discharge sought by the bankrupt. The referee has reported in respect of the sixth specification, stating:

"While the whole character of the proceedings of the bankrupt are such as to excite nothing but suspicion on behalf of the creditor, the real gravamen of the charge, I think, is his concealment of his interest in the real estate in Floral Park, by the omission of any mention of the same or of any interest in the same from his schedules in bankruptcy, from which it follows that by said omission he made a false oath in his proceedings in bankruptcy."

As the evidence does not sustain any of the other specifications, it will be sufficient to confine attention to the sixth specification, which charged the bankrupt with knowingly, fraudulently, and willfully omitting from his schedules property belonging to his estate; i. e., the Floral Park property. The testimony consists of the examination of the bankrupt under Bankruptcy Act, § 21a (Comp. St. § 9605), and further examination of the bankrupt before the referee on the hearing on the specifications of objections to discharge.

The uncontradicted testimony of the bankrupt sets forth a reasonable transaction, entirely worthy of belief, and completely inconsistent with any purpose to conceal an asset, and wholly lacking in proof of any agreement, actual or implied, of a secret trust or other arrangement whereby title, legal or equitable, to the Floral Park property remained in the bankrupt. The bankrupt owed $3,500 rent to his landlord, the objecting creditor. On February 8, 1918, he received a letter from the landlord's attorney, demanding the rent. He called upon the attorney the next day—i. e., February 9—and arranged a settlement on the basis of $500 cash and the remainder in notes of $1,000 each, payable March, April, and May.

The bankrupt testified that the landlord's attorney said, in response to the bankrupt's request to wait until the 1st of the month (March):

"No; if you want to settle, Miss Frese [the objecting creditor and landlord] told me she wants $500 right now, and, no matter how you get it, get it."

It is entirely clear that the bankrupt wished to remain in business and was struggling hard so to do, and he was confronted with the necessity of raising $500 in cash, else his landlord would not extend further indulgence. At this time, the bankrupt owned some unimproved suburban property, consisting of nine lots, each 20 feet by 100 feet, situate at Floral Park. He had bought these lots on installments for $7,200, and they were subject to a mortgage of $1,500, owned by his wife's brother-in-law, one Molineaux, and given for advances to the bankrupt in connection with the installment payments.

In trying to satisfy his landlord the bankrupt offered the lots to her. This is the testimony:

"Q. Did you offer those lots to Miss Frese, the objecting creditor in this proceeding, for sale? A. I did.

"Q. Did you also offer these lots as security for the money you owed her as rent? A. I did.

"Q. Did you also offer these lots to Mr. Fine, her attorney? A. I did, in his own office.

"Q. Did you have a conversation with Miss Frese about these lots? A. I did.

"Q. State what conversation you had with Miss Frese about the value placed on those lots? A. I have given her the papers from the Title Guarantee Company, from those Floral Park lots, in both parcels, and I told her: 'Here are the parcels, and, if you desire, I will give you a guaranty for the rent of those lots, or I will make you a bill of sale but take it in as a mortgage for the rental that I owe you, or for any amount that you may desire.'

"Mr. Fine (attorney for objecting creditor): You mean take a mortgage on the lots for the rental?

"The Witness: For rental or sale, or any way she desires. I also offered her 64 East Fourth street property.

"Q. Did she tell you that she had spoken to any real estate men, or any banks, with reference to placing a valuation on these lots? A. She had returned me those papers, and she said both the banks told her the lots ain't worth anything to her.

"Q. Did you, between the 8th day of February, 1918, and the 13th day of February, 1918, offer these lots for sale to anybody else, besides Mr. Molineaux? A. I offered in the office of Counsellor Fine."

The bankrupt further testified, without contradiction, that he had a talk with one Roson, an officer of the Floral Park Villa Company. "I asked him," testified the bankrupt, "to give us the value of those lots, and I also asked him whether he can get me a buyer to buy those lots; and his answer was that at present 'I can't give you any buyers, and I can't put any value on those lots.' He said, 'If you want a mortgage to build a house, you can have it; but anything but a mortgage I can't give you. We have trouble to sell our own real estate.'" He also offered the lots without success to one Oster, of Brooks & Brooks, Thirty-Fourth street, and Oster said he could not get a purchaser. Finally, as a natural and last resort he succeeded in inducing Molineaux to take a deed for $500 and wipe out the mortgage—in reality, a consideration of $2,000.

There was no testimony adduced by the landlord as to the value of these vacant lots at that time. The war was on, and I should be greatly surprised if any reputable real estate expert could be found who would be willing to testify that there was any market in February, 1918, for vacant lots in Floral Park. That Molineaux should finally have helped the bankrupt as he did is entirely normal.

The next step is briefly told in the following testimony:

"Q. When you got the check for $500 from Mr. Molineaux in payment for these lots, did you speak to Miss Frese on the telephone? A. I did.

"Q. Did you tell her that you had the check ready for her? A. I did.

"Q. And what did she tell you? A. She referred me to the lawyer.

"Q. Did you speak to Mr. Fine on the telephone? A. I did.

"Q. And what did Mr. Fine tell you? A. Did I speak to Mr. Fine when?

"Q. On the 13th of February? A. I spoke to the office of Mr. Fine.

"By the Special Master: Q. What did you say? A. I asked Mr. Fine whether we shall come down to his office. I told Mr. Fine that I had a tele-

phone call from him, which my landlady has delivered to me, that it is all off; that Miss Frese would not accept the proposition, and therefore I can do nothing of the kind.

"Q. Now, I ask you again: What did you say to Mr. Fine, or his office, when you spoke to him on that day? A. I told him I had sold the lots, and I had a certified check still in my possession for $500.

"Q. And you offered it to him, did you? A. I offered it to him.

"Q. Now what did he answer? A. He answered that he can't do it, because Miss Frese wouldn't stand for it.

"By Mr. Sanders: Q. How long did you keep this check in your possession? A. Several days.

"Q. Did you, during the interim that you had this check in your possession, have any conversation with Miss Frese? A. I saw Miss Frese personally.

"Q. State what conversation you had. A. I said, 'I was at the office of Mr. Fine, and Mr. Fine spoke to you and made all the arrangements;' and I told her, 'I sold the lots which I offered you, and I have a certified check for $500, and here you back out.' I said, 'I am going to try my best to make my payments, and give me a chance to remain in business.' She said, 'Mr. Fine was too lenient for you.'

"Q. How long were you negotiating with Miss Frese with regard to the settlement of your rent? A. Right along she has carried me.

"Q. No; I mean from the 13th of February? A. From the 13th of February right up to the 28th.

"Q. You spoke to her every day? A. I spoke to her every day.

"Q. With reference to settling up your back rent? A. With reference to settling up my back rent.

"Q. Did you at any time, Mr. Rosenberg, ever receive from Mr. Molineaux $1,500 back in cash for the mortgage that you gave him? A. I did not.

"Q. Did you at any time receive back from Mr. Molineaux $500 in cash for the check that he gave you? A. I did not.

"Q. Does Mr. Molineaux, or anybody else, hold any cash for you, subject to your order, or your demand? A. No, sir."

How, in the circumstances related supra, it can be said that the bankrupt concealed the Floral Park property as an asset, is beyond my understanding. When the bankrupt found that his landlord was pressing and would not carry out the settlement agreed to by her attorney, the bankrupt paid out the $500 for merchandise and salaries. He did not deposit the check in his bank account, but cashed it at his own bank, and paid legitimate bills with its proceeds.

"We bought a bill of goods from Elk Hat on the 19th of February for $165, which we paid in cash, and the balance of $335 I deposited in the bank in small amounts, to be payable small checks, and I give out my creditors head checks. I deposited small amounts to give them."

Much was made in argument as to an attempt in the 21a examination to conceal who Molineaux was. The following testimony sequentially given shows that there is no significance in this contention:

"Q. Who is the man held that mortgage for $1,500? A. Mr. Molineaux.

"Q. Who is Mr. Molineaux? A. He is a neighbor.

"Q. Any relative or friend of yours? A. Yes; a brother-in-law to my wife.

"Q. When was this sale made for this $500? A. That was made on February 13th."

From the foregoing outline, supplemented by all the testimony, it is plain that there is no evidence of a concealment of an asset, or of any agreement by which the bankrupt had or was to have any beneficial interest, legal or equitable, in the lots conveyed by him.

On the contrary, the transaction appears in every way to have been as testified to by the bankrupt without contradiction, and his testimony is well corroborated by all the surrounding and uncontradicted circumstances.

The recommendation of the referee is not approved, and the bankrupt may have his discharge.